WILLIAM W. WATTS AND ARTHUR WATTS'S EXECUTORS, AND WILLIAM W. WATTS, ARTHUR WATTS, JOSEPH SCOTT AND ELIZABETH HIS WIFE, HEIRS AND LEGAL REPRESENTATIVES OF JOHN WATTS, DECEASED, APPELLANTS v. WILLIAM WADDLE AND ALEXANDER WADDLE'S ADMINISTRATORS, AND ALEXANDER WADDLE, AND WILLIAM, JOHN, LUCY, EDWARD AND ARGUS WADDLE, INFANTS, BY BENJAMIN G. LEONARD THEIR NEXT FRIEND, CHILDREN AND HEIRS OF JOHN WADDLE, DECEASED, AND WILLIAM LAMB.

decree of a specific performance of a contract to purchase a tract of land refused, in consequence of delay and a defect of title.

The aid of a court of chancery will be given to either party who claims specific performance of a contract; if it appear, that in good faith, and within the proper time, he has performed the obligations which devolved upon him.

It is not in the power of one state to prescribe the mode by which real property shall be conveyed in another. This principle is too clear to admit of doubt.

In the argument before this court a new ground of relief was assumed, which had not been made in the circuit court. That if the court should not decree a specific performance of the contract to purchase the land, yet as the purchaser had been in the possession thereof, the complainants are entitled to a decree for the rents and profits of the land while he was in possession. By the court: there is no rule of court or principle of law which prevents the complainants from assuming a ground in this court which was not suggested in the court below; but such a course may be productive of much inconvenience and some expense.

Although there is no specific prayer in the bill to be paid the rents and profits, yet the court think, that under the general prayer, this relief may be granted. Under this prayer only relief may be given for which a basis is laid in the bill. In this case the possession of the land by the defendants is alleged, and the demand for rents and profits would result from this fact. There is no pretence that this demand was taken into view in the action at law. As it consisted of unliquidated damages, it was not a proper subject for an offset.

APPEAL from the circuit court of the United States for the district of Ohio.

In the circuit court of Ohio, John Watts, a citizen of the state of Kentucky, filed a bill in chancery against John Waddle and William Lamb, the appellees, to obtain a perpetual injunction to stay proceedings by John Waddle on a judgment obtained in the circuit court against him, for damages for the non-performance of a contract made by him with John Lamb in November 1815, which contract had been assigned

[Watts et al. v. Waddle et al.]

by him to John Waddle; and also to compel Waddle or Lamb to a specific execution of the contract. The contract was for the sale of certain lots of ground in the town of Chillicothe to William Lamb, for which John Watts agreed to give a good and sufficient general warranty conveyance, by the 1st day of February 1816, or as soon as a final decree should be rendered in the circuit court of the United States, in a suit instituted to compel Nathaniel Massie and others, to make a conveyance to the complainant of the legal title to the said lots, the elder equitable title thereto being in the complainant. William Lamb, or his assignee John Waddle, was in possession of the premises at the time of the contract, and continued to hold the same until and after the judgment for the damages.

Numerous and continuing obstacles, arising, as was alleged, from other causes than the fault or laches of John Watts, interposed and prevented the conveyance of the premises by a sufficient legal title until 1826.

In 1824 William Lamb assigned the contract between him and John Watt to John Waddle, who thereupon instituted the suit against John Watts, he having been found in Ohio; and obtained a judgment for damages for the non-performance thereof, amounting to seven thousand seven hundred and forty-five dollars and fifty cents.

In 1826 John Watts tendered to John Waddle, as the assignee of John Lamb, a deed of conveyance of the lots, in conformity, as was alleged, with the contract of 1815, which was refused by him.

The circuit court of Ohio dismissed the bill of the complainants; and the executors and legal representatives of John Watts thereupon prosecuted this appeal.

The facts of the case are stated more particularly in the opinion of the court.

For the appellants, Mr Creighton and Mr Clay contended, that the decree of the circuit court ought to be reversed on the grounds:

1. That the said circuit court ought to have decreed a specific execution of the contract between Watts and Lamb; Watts having throughout manifested a bona fide intention to fulfil his covenant, and having, for that purpose, done all that was in-

[Watts et al. v. Waddle et al.]

cumbent upon him to possess himself of the legal title, which he tendered, as soon as he acquired it, to Waddle; and neither Lamb or Waddle, who have constantly remained in quiet possession of the property, having ever demanded a deed, or sustained any injury in consequencee of not receiving one.

2. But if the court below ought to have refused to compel Waddle now to receive a title from Watts, it ought to have made Lamb and Waddle liable for the rents and profits of the estate, from the date of Watts's covenant to the termination of the suit; inasmuch as they had recovered a judgment for principal and interest of the purchase money, and had peaceably enjoyed the possession and reaped the fruits of the property, up to this time. And this allowance, for rents and profits, ought to have been applied by the court in abatement of the amount of the judgment at law.

They cited 5 Peters, 264. 2 Peters's Condensed Reports, 247. 1 Wheat. 179, 196. 6 Wheat. 528. 6 Cranch, 148.

Mr Leonard, for the appellees, argued:

1. That according to the contract, the deed was to have been delivered in 1818, when the appellant obtained a final decree in the circuit court in the suit against Massie and others; and not being at that time able to make a legal and sufficient title, the complainant could not, in 1826 or afterwards, call on the appellees to accept of the title. The right of the appellees to damages for the breach of the contract of 1815, could not be impaired by the subsequent ability of the appellant, if it existed, to make the title. Cited, Sug. on Vendors, 249. 1 Harrison's Chancery, tit. Decree, 424, 425, 426. 1 Mad. Chan. 430.

2. The rents and profits could not be set off in the action for damages; nor should this court now give the appellant the benefit of the claim to them, against the judgment of the circuit court. Cited, Coop. Equity, 13, 14, 333. 2 Atk. 3, 141, 325. 12 Ves. 48. 17 Ves. 114, 118. 2 Ves. Sen. 225. 2 Peters, 612. 1 Wheat. 179. 7 Wheat. 535.

Mr Justice M'LEAN delivered the opinion of the Court.

This suit was brought into this court by an appeal from the decree of the circuit court for the district of Ohio. The bill was filed in that court by the complainant to compel the specific

execution of a contract, entered into with the defendant Lamb, on the 1st day of November 1815; by which the complainant bound himself to convey certain out-lots and other land, adjacent to the town of Chillicothe, to the said Lamb, for the consideration of four thousand seven hundred and sixteen dollars, and sixty-six and two-thirds cents. The conveyance was to be made on the 1st day of February ensuing, or so soon as a final decree should be rendered by the United States circuit court for the district of Ohio, in the suit then pending in said court, wherein the said Watts was complainant and Nathaniel Massie and others defendants.

That suit had been brought by Watts against Massie and others, including the above defendant Lamb, to recover one thousand acres of land, which included the land sold by the above contract, to which Watts derived title from Ferdinand O'Neal, who claimed under an entry made by virtue of a warrant which had been granted to him for military services. To recover this tract of land, Watts first brought a suit against Massie in the federal court of Kentucky, charging him with having fraudulently surveyed the lands of O'Neal, so as to throw it within the lines of a survey, in the name of Powell, which was owned by Massie, or in which he had an interest. In this suit Watts prevailed, and an appeal being taken to the supreme court, the decree of the circuit court was affirmed.

To carry this decree into effect in the state of Ohio, suit was instituted by Watts in the circuit court; and this was the suit referred to in the contract between Watts and Lamb.

By the decree in Kentucky, which was affirmed by the supreme court, O'Neal's entry 509 was made to embrace the land specified in the contract; and the decree required Massie to convey to Watts all the land covered by the survey of the above entry, although within entries No. 503 and 2462, amounting to one thousand acres; and Watts was required to convey one thousand acres, which were within the calls of entry 509. Neither of these conveyances has been executed.

A final decree was obtained in this suit in the circuit court for Ohio, in favour of Watts, in January 1818. Neither Lamb nor Massie took an appeal in this case to the supreme court; but it was appealed by some of the defendants, who, it is stated, had no interest in the land now in dispute. A final decree in

favour of Watts was entered in the supreme court in September 1822.

In the year 1818 it was ascertained that no patent had been granted on O'Neal's warrant, and, consequently, that Massie did not possess the legal title; but, on application, a patent was issued to Watts on the 1st of March 1826. It appears, however, that a patent had issued to the heirs of Powell; on an entry 503, on the 4th of November 1818, which covered a part of the land that Watts had sold to Lamb.

Finding that the legal estate was vested in Powell's heirs, Watts commenced a suit against them in the circuit court of Kentucky, and obtained a decree for the land contained in their patent, which interfered with his title, in the fall of the year 1826.

Lamb having assigned the covenant to his co-defendant Waddle, in January 1824, he commenced a suit against Watts for the recovery of the consideration paid: and at July term 1826, obtained a judgment in the circuit court for seven thousand seven hundred and forty-five dollars and fifty cents, damages and costs.

On the 3d of July, before the judgment, Watts tendered to Waddle a deed in fee simple for the land, in the contract agreed to be conveyed, with the costs of the suit, which he refused. A bill was then filed by Watts to enjoin the judgment and compel the defendants to accept of a deed. The bill contains also a prayer for general relief. By the decree of the circuit court this bill was dismissed, from which the complainant appealed to this court. Watts having died since this suit has been pending in this court, it is now prosecuted by his heirs.

The complainants insist, that, under all the circumstances of the case, they are entitled to a specific execution of the contract. Of this there can be no doubt, if it shall appear, that there has been a substantial compliance with the covenant on the part of their ancestor. The aid of a court of chancery will be given, to either party, who claims a specific execution of a contract; if it appear that, in good faith and within the proper time, he has performed the obligations which devolved on him.

It is insisted that the delay which occurred in making a

[Watts et al. v. Waddle et al.]

deed was unavoidable, and is in no manner attributable to negligence or want of good faith in Watts. That it grew out of facts which were alike unknown to him, and the defendant Lamb, at the time the contract was made. That the defendant Lamb and his assignee Waddle have had the unmolested possession of the land purchased, enjoying the rents and profits of it; and that no circumstance has been proved which goes to show that the defendants, or either of them, have suffered any injury from the delay in making the deed.

Various facts are adverted to which go to prove vigilance on the part of Watts, in prosecuting different suits and in other respects, in order to obtain the legal title, that he might make the conveyance. And that so soon as he was enabled to do so, he lost no time in tendering the deed duly executed, and also the costs which had accrued on the action at law.

On the part of the defendants it is contended, that as the contract was the result of a compromise, they are entitled to a strict execution of it.

Under a purchase which Lamb had previously made of Massie and others, he was in possession of the land embraced by the contract, at the time it was concluded. And he was, no doubt, induced to enter into the contract with Watts, under the impression that he had the equitable, and would soon possess himself of the legal title. The suit then pending had been brought for that purpose, and as Lamb was one of the defendants, and had no title either legal or equitable, he was desirous of obtaining a title from Watts.

If Lamb did not enter into the possession under Watts, it seems that he acknowledged Watts to possess the better title; and by making the contract with him, was willing to hold the possession under him.

It is not perceived, therefore, that there is any thing in the circumstances under which this contract was made, which would take it out of the rule of law generally applicable to cases of contract for the purchase of real property. The contract, it is true, was the result of a compromise respecting a legal controversy; but it was entered into with a full knowledge on the part of Lamb, that Watts did not possess the legal title, but expected to obtain it by a final decree in the case referred to.

A final decree was obtained in that case, in the circuit court, in January 1818; and it is insisted, that it was the duty of Watts, at that time, to execute the conveyance; and that not having done so, he is guilty of such negligence as to prevent the relief he now asks in equity.

In the contract there was a reference to the final decree of the circuit court, but as the decision of that court was not final in the case, and as an appeal was actually taken, by some of the defendants, to the supreme court; it may reasonably be inferred that this contingency was within the calculation of both parties at the time of the contract. It must have been known to them, that an appeal would vacate the decree of the circuit court, and that after it was taken, any conveyance made under such decree would be inoperative. The final decree, therefore, in the circuit court, as referred to in the contract, could only mean, in the event that the decree of that court should finally determine the matter of controversy. But if an appeal should be taken from such decree, then the final decree should be made in the supreme court. There can be no difficulty in coming to the conclusion that both parties referred to a final decision of the case; and to such a decree as should vest the legal title in Watts. And as such a decree was not obtained until 1822, it is clear that until that time no negligence is imputable to Watts.

It would be within the spirit of the contract to say, that Watts was bound to use ordinary diligence in the prosecution of the suit both in the circuit and supreme court. But there is no charge of a want of diligence in this respect.

Until 1818 Watts, as well as the defendants, supposed that the legal title was vested in Massie. There is no ground to impute fraud or imposition to Watts in reference to this fact. When he made the contract, and up to the time specified, there can be no doubt that he believed a final decree against Massie would give him the legal title. When he made the contract with Lamb, had he known the fact that Massie had not the legal title, and concealed it, equity could give him no relief. The concealment would have been a fraud on Lamb, which would have enabled him to annul the contract. But Watts acted in good faith, and being mistaken, unless some injury consequently resulted to Lamb, or an unreasonable delay fol-

lowed, equity would look with a favourable eye to the specific execution of the contract.

Finding that the legal title was vested in Powell's heirs to a part of the land embraced by the contract, Watts commenced a suit in chancery against them in the circuit court of the United States of Kentucky, and obtained a final decree for the land. In pursuance of this decree, a commissioner appointed by the court, under a statute of Kentucky, executed a conveyance in the fall of 1826.

In July 1826, a few months after Watts obtained a patent for the land, he tendered a deed to Waddle; and in November 1826, after the decree was obtained against Powell's heirs, it is insisted a deed was again tendered, both of which were refused by the defendant Waddle.

The suit of Waddle, to recover back the consideration money, was commenced in October 1824; and prior to its commencement, Waddle offered to surrender the possession of the premises.

When this bill was filed by Watts, it appears, from the facts in the case, that he did not possess the legal title. The conveyance under the decree against Powell's heirs, had not, at that time, been executed. But this deed being afterwards obtained, Watts may be considered as vested with all the title conveyed by it; and also the title under the patent, which was granted to him; and the question arises, under these facts, and other circumstances in the case, whether the complainants are entitled to a specific execution of the contract.

It appears from certain depositions taken in the cause, in the spring of 1829, that this property, since the purchase, has depreciated in value one half; but the witnesses do not state how much of that depreciation has taken place since 1822.

The defendants' counsel insist, that independent of the objection founded upon the lapse of time, there are several material defects in the title of Watts; and th' the court cannot, under such circumstances, compel the defendants to receive it.

It is objected, that a suit is now pending in the general court of Kentucky, by one Henry Banks, who claims the warrant on which the entry was made, under which Watts claims; and it is alleged, that the decree against Powell's heirs did not give Watts a good title.

[Watts et al. v. Waddle et al.]

In October 1821, it appears Banks filed his bill against John Watts and the unknown heirs of Ferdinand O'Neal, in which he stated that O'Neal was entitled to land for services as a captain, in the Virginia line or continental establishment, amounting to at least four thousand five hundred acres; and that for a valuable consideration, he transferred his right to one Thomas Washington; that Washington, in November 1790, authorised one Thomas Shields to make sale of said lands; and that on the 1st of March 1791, for a valuable consideration, he transferred the said lands to the complainant.

He further states, that after the above assignment to Washington, O'Neal fraudulently transferred a warrant for four thousand acres of said land; and that a certain John Watts had procured grants for a part of the said four thousand acres, under an assignment from Francis and Charles Scott, made on the 11th of October 1799. And it is alleged, that Watts had full notice of the previous transfer by O'Neal, before the grants were obtained. The bill contains a prayer for a conveyance of the land specified, and also for general relief.

The assignments set forth in the bill are proved by the exhibits in the case.

Process appears to have been served on Watts the 24th October 1821, and the cause was regularly continued until August 1826; when an order was made, that public notice be given in a newspaper printed at Frankfort, to the unknown heirs of O'Neal, under a special statute of Kentucky. And from this time the cause seems to have been regularly continued, up to January term 1829.

It is insisted, by the complainants' counsel, that the pendency of this suit cannot affect, injuriously, the title of Watts; as the court of Kentucky has not jurisdiction of the subject matter, so as to transfer the title to land in Ohio; and that from the dilatory manner in which the suit has been prosecuted, it is manifest that Banks can have no expectation of success.

The general court of Kentucky have jurisdiction of the controversy; and as process was served on the defendant Watts, their powers are ample to enforce their decree, in personam, or to direct the execution of a deed, should the land be decreed, by, a commissioner, as the statute of Kentucky authorises.

Banks has certainly been dilatory in the prosecution of his suit, but it is, by no means clear, that by his negligence, in this respect, he has lost any of his original equity against Watts. And this is the question now under consideration. It is not the case of an innocent purchaser, for a valuable consideration, without notice; but, the inquiry is limited to the rights of the litigant parties. If Banks has been negligent, what vigilance has been shown by Watts, to terminate the controversy.

It is said, there has been no rule for answer on Watts. The record does not show, whether there has been a rule for answer; and as such a rule, if entered, ought to appear, it may fairly be presumed that no such order has been taken. But this did not preclude Watts from taking an order, which would compel the complainant either to dismiss his bill, or bring it to a hearing.

It would seem, therefore, if Banks has been negligent in pursuit of his rights, Watts has shown no vigilance in the defence of his.

No part of the proceeding in the suit against Powell's heirs, in the circuit court for Kentucky, is contained in the record, except the decree. The persons named defendants, are John M. Powell, Francis Powell, Robert Powell, Margaret P. Bledsoe, formerly Margaret P. Powell, wife of Joseph Bledsoe, Nancy J. Rickets, wife of Charles H. Rickets, formerly Nancy J. Powell, Mary B. Jones, wife of William Jones, formerly Mary B. Powell and William M. Powell and Susan W. Powell, ———— Carr, and Fanny his wife, heirs and representatives of Robert Powell deceased. By the decree, the defendants were required to convey to the complainant, six hundred and eight acres of land particularly described in the decree. And if the defendants or any of them failed to make the conveyance, the court appointed John H. Hanna commissioner, under the statute of the state, to make the deed. It is admitted, that the deed was duly executed by the commissioner.

As the record of this case is not before the court, it does not appear whether process was served on all the above defendants, nor whether they answered the bill. But in reference

to the object for which this decree is introduced, the preparatory steps may be presumed to have been regularly taken.

Several objections are made to this decree. It being entered against femes covert, it is insisted that the interest of the husbands cannot be affected by it. This seems to be considered as a matter of form by the complainants' counsel; and if it be a matter of substance, it is contended that the full record would show that all necessary and proper parties were made by the bill. And it is denied that the decree furnishes any evidence that the husbands of the females named as having been married, were living at the time of the decree.

The females are stated to be the daughters of Powell, and the wives of the persons named. This must be considered as conclusive of the fact that their husbands were living. If they had been dead, the females would not have been named as the wives of certain persons. Under the circumstances, no presumption arises that the husbands are dead; nor can it be necessary for those who impeach the decree to show that they are living.

As the husbands of the daughters of Powell, where issue has been born, have a life estate in the premises in question, their interests cannot be affected in a case where they are not parties.

That some or all of the persons referred to are possessed of this interest, may fairly be presumed from the circumstances. A decree, to be operative, must contain sufficient certainty in itself. It cannot be aided by presumption.

It is clear, that the record at length could not obviate this objection. The defendants are named, and there is no reference by which the decree could be made to operate on the rights of the husbands. But if it were admitted that a full record might obviate this objection, it is not incumbent on the complainants to produce it. It rests with them to make out their case. To obtain the object of their bill, it is essential to show that a clear title was tendered to the defendant Waddle, or at least, that they are able to make him a good title. And this they cannot show, unless there was a full divestiture of the title from Powell's heirs.

It is also objected, that the widow of Robert Powell is still living, and is entitled to her dower in the premises. She is

SUPREME COURT.

proved to have been living since the commencement of this suit, and there is no evidence of her death; and one of the witnesses states that she had an agent or assignee at Chillicothe a few years since, claiming her right of dower.

But it is contended, that the widow of Powell could not recover dower in this land, as, at most, he could only be considered as holding the land in trust for Watts. In proof of this, the decree against his heirs is referred to.

If such were the fact, under the law of Ohio the widow would not be entitled to her dower; but the decree referred to could not be considered as conclusive of the rights of the widow. That decree may have been entered by collusion, or under circumstances that would not bind the parties to it, if the proper steps were taken to set it aside. It is presumed that the widow, in setting up her right of dower, would be permitted to show the nature of the title under which her husband claimed. This claim, therefore, may not be so destitute of all merit and legal propriety, as the counsel for the complainants seem to consider it.

But the most decisive objection to the decree against Powell's heirs is, it is contended, that it does not vest the legal title in Watts.

A decree cannot operate beyond the state in which the jurisdiction is exercised. It is not in the power of one state to prescribe the mode by which real property shall be conveyed in another. This principle is too clear to admit of doubt; but it is insisted, that the deed executed by the commissioner, under the decree, by virtue of a statute of Kentucky, was a legal conveyance in that state, and as such, by a statutory provision, is good in Ohio.

The words of the statute referred to are, " that all deeds, mortgages and other instruments of writing for the conveyance of lands, tenements and hereditaments, situate, lying and being within this state, which hereafter may be made and executed and acknowledged or approved in any other state, territory or country, agreeably to the laws of such state, territory or country, or agreeably to the laws of this state, such deed, mortgage or other instrument of writing shall be valid in law."

The deed executed by the commissioner in this case, must be considered as forming a part of the proceedings in the court

of chancery. and no greater effect can be given to it, than if the decree itself, by statute, was made to operate as a conveyance in Kentucky, as it does in Ohio.

The question then arises, whether, by a fair construction of the above provision, it is in the power of a court of equity, sitting in Kentucky, by force of its decree, to transfer real estate in Ohio.

Can this effect be given to such decree by this statute? It is believed that no state in the union has subjected the real property of its citizens to the exercise of such a power. Neither sound policy nor convenience can sustain this construction; and unless the language of the statute be imperative, no court could sanction it.

The legislature of Ohio could never have intended by this provision, to place the real property of the citizens of that state at the disposition of a foreign court. The language used in the act does not require such a construction. It refers to deeds executed by individuals in any other state; and not to conveyances made by the decree of a court of chancery. This is the true import of the section, and it does not appear that the courts of Ohio have given it a different construction. Thus construed, it promotes the convenience of non-residents who own lands in Ohio, and may desire to convey them; and in no point of view can it operate injuriously to the interests of citizens of the state.

In this view it appears, that Watts did not acquire the legal title from Powell's heirs under the deed of the commissioner; and consequently he was unable to convey the legal title to Waddle.

The objections then to the deed tendered by Watts are, that the husbands of the femes covert named in the decree, were not made defendants, and that there is no divestiture of their right; that the right of dower remains in the widow of Robert Powell; and that, at most, Watts derived only an equitable estate under the decree against Powell's heirs.

These objections are deemed decisive by the court. Under the deed tendered to Waddle, he could not defend himself against an action of ejectment commenced by Powell's heirs, or by any other persons claiming under a legal conveyance from them. A decree of a court in Ohio, having jurisdiction

of the subject matter, is necessary to give a legal effect to the decree in Kentucky. And even if this had been done, there would still exist serious objections to the title.

The principle is too well settled to require any reference to authority in support of it, that a vendor to entitle himself to a specific execution of the contract must be able to make a clear title. No court of chancery will force a doubtful title on the vendee; and it is always necessary that the vendor should not only show a proper degree of vigilance on his part, but that in all things he had complied, or was able to comply, with the contract when he seeks a specific execution of it.

Although in the present case a willingness has been shown by Watts to convey to Waddle the land embraced in the contract, it is evident that he cannot convey a good title. The title is not only shaded with doubt, but there are defects which cannot be obviated, except by the action of a court of equity. The contract which is the foundation of this suit, was entered into by Lamb to get clear of a legal controversy; and if his assignee shall be compelled to accept a title radically defective, he would be left in a worse condition than Lamb was in before the compromise. The consideration money has all been paid, and the result to the assignee would be, should he be compelled to receive the deed tendered, one or more law suits. The court are therefore clear, that the complainants, for reasons stated, are not entitled to a specific execution of the contract.

A new ground of relief has been assumed in the argument here, that was not made in the circuit court; which is, that although this court should be of the opinion that a specific execution of the contract ought not to be decreed, still, the complainants are entitled to a decree for the rents and profits of the land while it was in the possession of the defendants.

The defendants object to this relief, first, because the bill is not so framed as to embrace it; and, secondly, because this claim was adjusted in the action at law, or might have been set up to lessen the demand of the plaintiff in that action.

There is no rule of court or principle of law, which prevents the complainants from assuming a ground in this court, which was not suggested in the court below; but such a course may be productive of much inconvenience and of some expense.

Although there is no specific prayer in the bill to be paid the

rents and profits, yet the court think that, under the general prayer, this relief may be granted. Under this prayer, any relief may be given for which the basis is laid in the bill. In this case the possession of the land by the defendants is alleged, and the demand for rents and profits would result from this fact.

There is no pretence that this demand was taken into view in the action at law. As it consisted of unliquidated damages, it was not a proper subject for an offset; and it appears that the judgment at law was rendered for the consideration money and interest.

That part of the decree of the circuit court which refused a specific execution of the contract, is affirmed; but in order to afford relief for the rents and profits, the decree dismissing the bill is opened, and the cause remanded for further proceedings.


This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Ohio, and was argued by counsel; on consideration whereof, it is ordered, adjudged and decreed by this Court, that that part of the decree of the said circuit court in this cause which refused a specific execution of the contract, is affirmed; but in order to afford relief for the rents and profits, it is further ordered and decreed by this Court, that the decree of the said circuit court dismissing the bill is hereby opened, and that this cause be and the same is hereby remanded to the said circuit court for further proceedings to be had therein, according to law and justice, and in conformity to the decree of this Court. And it is further ordered, that each party pay his own costs in this Court.